UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JENNIFER S. DAVIS,     )
            )
     Plaintiff,  )
  v.        )
            ) CASE NO. 1:08-cv-0821-DFH-DML
MICHAEL J. ASTRUE,   )
Commissioner of the Social  )
Security Administration,   )
            )
     Defendant.  )

ENTRY ON JUDICIAL REVIEW

Plaintiff Jennifer S. Davis seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance benefits. Following a hearing, an Administrative Law Judge (ALJ) determined on behalf of the Commissioner that, without consideration of her substance abuse, Ms. Davis did not have an impairment or combination of impairments that met or equaled the criteria for any listing set forth in the Listing of Impairments. Ms. Davis seeks judicial review of the ALJ's determination. As explained below, the court affirms the ALJ's decision. It is supported by substantial evidence, and the court finds no reversible error.

*Background*

Jennifer Davis was born in 1971 and was 36 years old when the ALJ found her ineligible for disability insurance benefits. Ms. Davis has completed high

school.  R. 142.  She has given birth to three children, none of whom are in her custody.   R. 19, 20, 902.   Ms. Davis' past relevant work history includes employment as an exotic dancer and traffic clerk.  R. 19, 145.

Ms. Davis applied for disability insurance benefits on March 24, 2004, complaining of frequent vomiting spells, bilateral knee impairments, anxiety, depression, and borderline personality disorder.   She claims that these impairments rendered her disabled within the meaning of the Social Security Act after September 15, 2000.

I.      *Vomiting Spells*

Ms. Davis suffers from frequent vomiting spells.  Medical records suggest she suffered from this condition as early as 2001.  In June of that year, Ms. Davis was evaluated by Dr. Stephen J. Carlson for complaints of nausea and vomiting. R. 563.  Dr. Carlson noted impressions of pancreatitis and hepatitis C.  He noted that Ms. Davis had failed to take Prevacid on a regular basis.  He recommended that she continue with her Duragesic and restart treatment with Prevacid.  *Id.*

In July and December  2001, Ms. Davis underwent successive endoscopies. R. 506-09. Dr. Carson diagnosed her  with mild esophagitis and gastritis.  R. 508-09.  In September of 2004, she was hospitalized for acute abdominal pain and acute pancreatitis.  R. 506-07.

In May 2004, Ms. Davis underwent an examination by Dr. Navjot Singh at the request of the state agency. R. 417-18. Among other things, Dr. Singh concluded that Ms. Davis' current symptoms did not fit with her previous diagnosis of chronic pancreatitis. R. 418. According to Dr. Singh, "it is unclear whether [Ms. Davis] is suffering from gastroparesis due to large use of narcotics." *Id.* He recommended she continue with her current medications and continue to follow up with her treating physician. *Id.*

In May 2005, Ms. Davis was hospitalized for "severe and debilitating" abdominal pain. R. 694. Despite this complaint, Dr. Jason A. Brooks noted a "completely normal basic metabolic profile." R. 695. He characterized Ms. Davis' chronic pancreatitis as secondary to alcoholism. R. 696.

Three months later in August 2005, Ms. Davis was again hospitalized for chronic pancreatitis. 716-718. She presented with excruciating abdominal pain but showed no objective signs of acute exacerbation of chronic pancreatitis. R. 718. For example, she was able to eat without difficulty. *Id.* Dr. Thomas Nowak questioned whether Ms. Davis' current condition was a manifestation of her polysubstance abuse. *Id.* He concluded that she might benefit from psychiatric consultation. *Id.*

In October 2006, Ms. Davis sought treatment for nausea, vomiting, and abdominal pain.  R. 746.  She was diagnosed with chronic pancreatitis and was instructed to follow up with Dr. Unzicker at the Open Door Clinic.  *Id.*

II.    *Bilateral Knee Impairments*

Ms. Davis testified that she has struggled with knee impairments since birth.  R. 904.  She first underwent a patellar realignment of her right knee in 1995.  R. 429, 433.  In September 2003, an MRI scan of her right knee showed evidence of an effusion in the knee and chondromalacia of the patella with loss of cartilage laterally.  R. 443.  Her doctor increased her anti-inflammatory dosage and continued her on Oxycontin "until such a time as she decides to have . . . surgery done."  *Id.*

In November 2003, Ms. Davis underwent arthroscopy of the right knee.  R. 429.  Initially, she responded well to this procedure, describing her condition as "a thousand times better."  R. 431.  Despite this optimistic expression, Ms. Davis returned to Dr. Egwu in January 2004 complaining of persistent pain in her right knee.  R. 430.  Dr. Egwu recommended that she continue treatment with strengthening exercises for her quadriceps muscles.  *Id.*

In March 2004, Ms. Davis was still complaining of marked pain.  She was able to extend and flex, but only with difficulty.  R. 425.  She had continued

difficulty getting up from a sitting position.  *Id.*  In May 2004, Ms. Davis elected to pursue surgery and underwent a patellectomy of her right knee.  R. 441.

In January 2006, Ms. Davis underwent a left knee arthroscopy with patellar chondroplasty.  R. 742, 744.  Ms. Davis tolerated the procedure well with no apparent complication.  R. 745.

III.    *Anxiety and Depression*

The medical evidence suggests that Ms. Davis suffers from severe anxiety and depression.  In February 2001, she was hospitalized for suicidal threats.  R. 662-83.  Dr. Brett Presley, M.D., noted that Ms. Davis had lost custody of her son in January and had been feeling suicidal "on and off" since that time.  R. 662. According to Dr. Presley, borderline personality disorder and substance abuse were her primary problems.  R. 672.  He recommended a regimen of medication and informed Ms. Davis that if she misused any of her prescriptions, she would not be placed on benzodiazepines in the future.  R. 673.

In November 2001, Ms. Davis was again admitted to Dr. Presley's care.  She presented with a suicidal ideation following a cocaine binge.  R. 626.  She characterized the binge as secondary to "unrelenting pancreatic pain."  *Id.*  Prior to this binge, Ms. Davis insisted she had not used cocaine since her

hospitalization in February 2001.  *Id.*  Upon discharge, Ms. Davis was offered several follow up options.  R. 628.  She elected to follow up with Dr. Presley.

In September 2002, Ms. Davis returned to Dr. Presley with signs of improvement.  R. 471-73.  She had been drug and alcohol free since January of that year.  R. 471.  Ms. Davis reported that she was doing very well, denying any psychotic or depressive symptoms with the exception of occasional insomnia.  *Id.*  Dr. Presley noted her marked improvement and recommended that she continue with her chemical dependency treatment to maintain sobriety.  R. 472.

In July 2004, Ms. Davis saw Howard E. Wooden, Ph.D., at the request of the Indiana Department of Family and Social Services Disability Determination Bureau.  R. 368-70.  Dr. Wooden noted that Ms. Davis exhibited no evidence of severe mental difficulties "other than perhaps an adjustment disorder with depressed mood."  R. 369.  He did note, however, that her history of substance abuse along with her "quasi antisocial" behavior was evidence of a borderline personality disorder.  R. 370.  Dr. Wooden assigned Ms. Davis a Global Assessment of Functioning (GAF) score of 70 (some mild functional symptoms).  *Id.*  Based on this evaluation, W. Shipley, Ph.D., later concluded that Ms. Davis' limitations appear to be "physical in nature."  R. 404.

That same month, Ms. Davis placed a call to Dr. Presley's nurse requesting an additional supply of Klonopin.  R. 159.  Dr. Presley denied this request, noting

that she had used a three month supply in a two month period.  *Id.*  Ms. Davis then returned to Dr. Presley complaining of stressors due to recent medical problems.  R. 155.  Dr. Presley noted her mood as restricted.  *Id.*  Although she denied recent substance abuse, he questioned this assertion.  *Id.*

In August 2004, Ms. Davis was again admitted for in-patient psychiatric treatment.  R. 165.  She complained of suicidal thoughts and depression.  *Id.* According to Dr. Jim Nicholas, M.D., Ms. Davis was upset because her mother was threatening to kick her and her son out of her home.  *Id.*  Dr. Nicholas diagnosed Ms. Davis with recurrent major depression, polysubstance dependence, and borderline personality disorder.  *Id.*

In June 2005, Ms. Davis was again hospitalized due to mental health issues.  R. 700-06.  Dr. Andrew Skinner diagnosed her with depressive disorder, generalized anxiety disorder, borderline personality disorder, and polysubstance dependency.  R. 704.  Ms. Davis tested positive for benzodiazepine and cocaine. R. 701.  She was returned to her individual therapist and psychiatrist, with Dr. Skinner noting her prognosis as "guarded at best."  *Id.*

In February 2006, Dr. Presley opined that Ms. Davis' impairments had prevented her from obtaining gainful employment.  R. 727.  According to Dr. Presley, "[d]ue to the severe and chronic nature of her illnesses," he could not foresee her situation changing in the future.  *Id.*

In March 2006, Ms. Davis was hospitalized in connection with a suicide attempt.  R. 763-65.  She had swallowed between 20 and 25 Seroquel tablets.  R. 763.  She tested positive for cocaine.  R. 765.  Upon discharge, Dr. Skinner recommended she follow up with her psychiatrist and therapist.  *Id.*[1]

### Testimony at the Hearing

On July 12, 2007, Ms. Davis testified that she had suffered from frequent vomiting spells for nearly eight years.  R. 903.  According to Ms. Davis, she vomited up to twenty times per day.  *Id.*  She testified that she had trouble keeping meals down and her condition "just progressively gets worse."  *Id.*  She attributed this affliction to chronic pancreatitis.  R. 902-03.

Ms. Davis testified about her knee impairments.  R. 904.  She explained that her kneecaps were attached to the wrong muscle group.  *Id.*  She explained that she had several surgeries on both knees, and described their condition as very poor.  R. 905-06.  She explained that she was prescribed crutches to help her walk; however, she used them only when her knees were "at their worst."  R. 907.

---

[1]In October 2006, an ALJ for the Indiana Family and Social Services Administration determined after a hearing that Ms. Davis met the state disability requirements for the Medicaid program.  R. 733.  This determination was made in part based on Dr. Presley's disability assessments.  R. 735.  Dr. Presley offered further assessments in February 2007.  R. 764-769.  Among other things, he concluded that Ms. Davis could not maintain a regular work schedule due to mental illness that was significantly exacerbated by her chronic pain.  R. 769. Because the state uses different standards for determining disability for purposes of Medicaid, this decision sheds little light on the issue under the Social Security Act.

Ms. Davis testified that she suffered from migraine headaches, anxiety, and depression.  R. 907-10.  According to Ms. Davis' testimony, her anxiety caused racing thoughts that interfered with her ability to recall.  R. 917.  She suffered from panic attacks and was unable to function in closed spaces.  R. 907-08.  She has attempted suicide more than twenty times in the past.  R. 907-16.  To cope with her anxiety and depression, Ms. Davis testified that she would self- medicate with cocaine.  R. 918-19.  Although this helped in the short run, she admitted it made matters worse.  R. 919.  She did note, however, that Klonopin helped "very much" with her anxiety.  R. 919.

Following her testimony, the ALJ sought to determine whether an individual with symptoms similar to Ms. Davis' could work.  He asked vocational expert Gail Corn:

> I'll ask you to assume a hypothetical individual the claimant's age, education and work experience who can do work at the light level, but has the following limitations.  This person is restricted to simple and repetitive work.  Can have no more than superficial interaction with the general public, co-workers and supervisors.  Must be allowed to take off work one day a month.  Can such a person do the prior work of this claimant?

R. 941.  Corn responded that such a person could work as a traffic clerk.  *Id.* Corn she listed a number of positions available in the region.  *Id.*  At the light level, there were 2,000 general office clerk positions, 5,000 hand packager positions, 14,000 assembler positions, and 4,000 inspector positions.  *Id.*  At the sedentary level, there were 4,500 positions available.  R. 941-42.

*Procedural History*

Ms. Davis filed for disability insurance benefits in March 2004.  ALJ Peter C. Americanos issued his decision denying Ms. Davis' application on August 1, 2007. Because the Appeals Council denied further review, the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Davis filed a timely petition for judicial review on October 2, 2008.  The court has jurisdiction under 42 U.S.C. § 405(g).

*Disability and the Standard of Review*

To be eligible for disability insurance benefits, Ms.Davis must establish that she was insured and that she suffered from a disability within the meaning of the Social Security Act.  To demonstrate disability under the Act, Ms. Davis must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  Ms. Davis was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her.  See 42 U.S.C. § 423(d).  Where alcoholism or drug addiction is

an issue, the Social Security Act provides: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423 (d)(2)(C).

This is a stringent standard in any case, and especially where drug addiction plays a role. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Also, unlike many private disability insurance policies, the fact that a person is no longer able to do the kind of work that is most familiar or for which she feels best suited by training, experience, and education is not sufficient to show disability. The Act's programs for the disabled provide important assistance for some of the most disadvantaged members of American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The ALJ's decision followed the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to determine whether Ms. Davis was disabled under the Social Security Act as of September 15, 2000. The steps are as follows:

(1)     Was the claimant engaging in substantial gainful activity?  If so, he or she was not disabled.

(2)     If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he or she was not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do his or her past relevant work?  If so, he or she was not disabled.

(5)     If not, could the claimant perform other work given his or her residual functional capacity, age, education, and experience?  If so, then he or she was not disabled.  If not, he or she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

At step one, the ALJ determined that Ms. Davis had not engaged in substantial gainful activity since the alleged onset of disability.  At step two, Ms. Davis suffered severe impairments, including bilateral knee impairments, hepatitis C, pancreatitis, polysubstance abuse disorder, borderline personality disorder, depression, and anxiety.  At step three, the ALJ found that Ms. Davis did not have an impairment or combination of impairments that met or equaled the criteria for any listing in the absence of substance abuse.  At step four, the ALJ determined

that Ms. Davis had the residual functional capacity to lift and carry up to twenty pounds occasionally, and up to ten pounds frequently.  She could tolerate no more than superficial interaction with supervisors, co-workers, and the general public.  She was restricted to performing simple and repetitive tasks, and needed to take off one day per month.  Based on that assessment, the ALJ found that Ms. Davis was not capable of performing her past relevant work.  At step five, however, the ALJ found that, in the absence of substance abuse (see 42 U.S.C. § 423(d)(2)(C)), Ms. Davis retained the capacity to perform a significant number of jobs in the national economy such as general office clerk, hand packer, and assembler.  Thus, the ALJ found that Ms. Davis was not disabled and was not entitled to disability insurance benefits or supplemental security income during the relevant period.

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). The court must examine the evidence that

favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski v. Halter*, 245 F.3d 881,888 (7th Cir. 2001). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*Discussion*

Ms. Davis argues that:  (1) substantial evidence fails to support the ALJ's finding her combined impairments did not meet Listing 1.02A (knee instability resulting in an inability to ambulate effectively); (2) the ALJ erred by failing to obtain expert testimony concerning medical equivalency with regard to her bilateral knee impairments; (3) the ALJ erred by determining that she was not entitled to disability benefits due to her substance abuse disorder; (4) substantial evidence fails to support the ALJ's credibility determinations; and (5) substantial evidence fails to support the ALJ's residual functional capacity assessment.  As explained below, these arguments are not persuasive.

I.    *Failure to Cite Listing 1.02A*

Ms. Davis argues that the ALJ failed to cite Listing 1.02A and failed to "meaningfully discuss any of the evidence proving disability due to her . . . bilateral knee problems."  Pl. Br. 23.  When considering an appeal from the Social Security Administration, the reviewing court is primarily concerned with tracing the ALJ's reasoning.  Thus, an ALJ's failure to refer explicitly to a relevant listing does not alone require remand.  *Rice v. Barnhart* 384 F.3d 363, 369-70 (7th Cir. 2004).  Remand may be necessary where failure to refer explicitly to a relevant listing is combined with a perfunctory analysis.  *Id.* at 370.  In this case, the court can infer from the written decision that the ALJ correctly recognized the potential applicability of Listing 1.02A.  See, *e.g.*, *Barnette v. Barnhart*, 381 F.3d 664, 668

(7th Cir. 2000) (noting that the ALJ correctly recognized a listing despite not citing it within the opinion).  The ALJ's opinion considered the limitations imposed on Ms. Davis by bilateral knee impairments.  R. 22-26.  Therefore, the balance of this inquiry centers on the ALJ's analysis of this affliction.

To meet Listing 1.02A, Ms. Davis had to demonstrate (1) a gross anatomical joint deformity, (2) chronic joint pain and stiffness or other limitation in motion, (3) medical imaging documenting the abnormality, and (4) an "inability to ambulate effectively."  20 C.F.R. pt. 404P, § 1.02A.  An inability to ambulate effectively is defined as an extreme limitation of the ability to walk that interferes very seriously with an individual's ability to initiate, sustain, or complete activities.  *Id.* at § 1.00B2b(1).  A finding of ineffective ambulation requires a limitation so serious that it does not permit ambulation without the use of a hand-held assistance device, which in turn, limits the use of both upper extremities.  *Id.*  Examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes" and "the inability to walk a block at a reasonable pace on rough or uneven surfaces."  *Id.* § 1.00B2b(2).

The ALJ discussed Ms. Davis' knee impairments in detail.  He noted the four surgeries between 1995 and 2006.  R. 24.  He acknowledged that Ms. Davis was scheduled for another surgery after the hearing date.  *Id.*  But the ALJ recognized that  there was no indication these surgeries were unsuccessful.  R. 26.  Ms. Davis was able to do laundry and cook.  R. 22.  She was capable of going to a store and

making purchases.  *Id.*  She was able to care for her child.  *Id.*  She relied on crutches only intermittently.  R. 24.

Although an ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability, an ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides.  *Diaz*, 55 F.3d at 308.  The question is not whether the ALJ discussed every piece of evidence; it is whether the ALJ built an accurate and logical bridge between the evidence in the record and the result.  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  The ALJ here conducted a sufficient analysis of Ms. Davis' bilateral knee impairments in reference to Listing 1.02A.  She did not meet the requirement of being unable to ambulate effectively.

II.     *Failure to Consult a Medical Expert on the Issue of Equivalency*.

Ms. Davis argues that the ALJ failed to obtain a medical expert's opinion to determine whether her symptoms were equal in severity to those described in Listing 1.02A.  Whether Ms. Davis' impairment equaled this listing is a medical judgment, and the ALJ must consider an expert's opinion on the issue.  20 C.F.R. § 404.15269(b).

At the initial and reconsideration levels, the signature of State agency medical consultants on a Disability Transmittal Form or other documents on

which medical or physiological consultants may record their findings, may serve as the basis for the determination of medical equivalency.  SSR 96-6p.  This assures that a physician designated by the Commissioner has considered the question of medical equivalence.  *Id.*

The record includes a Disability Transmittal Form signed by Drs. Whitley and Universaw, R. 39, and a residual functional capacity assessment by Dr. J. Sands and affirmed by Dr. B. Whitley.  R. 406-13.  These signatures, completed and signed in accordance with the Commissioner's normal and usual procedures in evaluating a disability claim, are sufficient evidence that a physician designated by the Commissioner has considered the question of whether Ms. Davis' impairments are medically equivalent to an impairment in the Listings of Impairments.  Ms. Davis' contention otherwise fails.

III.    *Substance Abuse*

Ms. Davis contends that the ALJ erred by concluding that her substance abuse was a contributing factor to her major depression, generalized anxiety disorder, and borderline personality disorder.  According to Ms. Davis, the ALJ should have first determined whether she was disabled and then assessed the impact of her substance abuse disorder.  Pl. Br. 31-32.  If the ALJ had followed this sequence, Ms. Davis contends, he would have concluded that her disability remained even in the absence of substance abuse.  *Id.*  The court disagrees.

The regulation requires an ALJ to determine first if a claimant is disabled and then assess what impairments would remain in the absence of substance abuse.   See 20 C.F.R. § 404.1535. If a claimant would not be considered "disabled" in the absence of substance abuse, substance abuse is deemed to be a factor material to the determination of disability.  See 20 C.F.R. § 404.1535(2).

The ALJ followed this sequence.   After considering the evidence, he determined that Ms. Davis' impairments, including of her substance abuse, met the criteria for disability.  R. 15-16.  However, the ALJ determined in the absence of substance abuse, Ms. Davis did not have an impairment or combination of impairments that met or equaled the criteria for any listing.  R. 18.

In addition, Ms. Davis argues that the ALJ erred by failing to accord weight to her treating physicians with regard to her mental impairments.  In doing so, Ms. Davis argues, the ALJ relied solely on the opinions of non-treating, non-examining agency physiologists.  As a result, Ms. Davis contends, the ALJ failed to note that her substance abuse disorder is a manifestation of her mental impairments.  The court disagrees.

The ALJ's determinations were supported by the findings of a number of medical practitioners.  R. 19-22.  In light of this evidence, he concluded that Ms. Davis' mental condition improved markedly when she was not abusing drugs or

alcohol.  R. 18.  The ALJ's findings are supported by substantial evidence, and Ms. Davis' arguments fail.


IV.    *The Credibility Findings*

Ms. Davis argues that the ALJ failed to comply with Social Security Ruling 96-7p when he found her testimony not fully credible.  According to SSR 96-7p, the ALJ must consider several factors when determining the credibility of a claimant's own testimony about the severity of her pain.  See also 20 C.F.R. § 404.1529.  This rule and the factors the ALJ must consider are treated in the Seventh Circuit as binding on the Social Security Administration.  *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).  The factors include:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that aggravate the symptoms; (4) the effectiveness and type of medication the claimant takes, as well as any side-effects; (5) treatment other than medication that the individual receives; (6) any other measures the individual uses or has used to relieve pain (*i.e.*, lying flat on his back); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529.


The ALJ need not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements.  SSR 96-7p. Although the ALJ may not disregard a claimant's subjective complaints merely

because they are not fully supported by the objective medical evidence, a lack of objective evidence is nonetheless a factor important to the ALJ's credibility determination.  See 20 C.F.R. § 404.1529(c)(2).

The ALJ did not err in his credibility finding as to Ms. Davis' testimony.  He thoroughly discussed the medical evidence in the record and considered Ms. Davis' subjective complaints.   The ALJ did not merely issue a conclusory statement.  He considered her daily activities.  R. 22, 24, 27.  He recognized that Ms. Davis was characterized as a known drug seeker.  R. 25.  He illustrated that she complains of migraine headaches, despite there being no medical evidence of this condition in the record.  R. 26.  He pointed out that there is no indication that Ms. Davis' knee surgeries were unsuccessful.  *Id.*  He observed that she had a full range of motion with a normal gait and station.  R. 26-27.  He concluded:  "The claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  R. 26.  The ALJ adequately articulated the reasons for his credibility finding, and the court does not find reversible error.

V.    *Residual Functional Capacity Assessment*

Ms. Davis' final argument challenges the ALJ's residual functional capacity assessment.  According to Ms. Davis, by failing to include a narrative discussion

of how all of the medical evidence supported his finding, the ALJ "committed a clear error of law."  Pl. Br. 35.

As previously stated, an ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides.  *Diaz*, 55 F.3d at 309.  The question is whether the ALJ built an accurate and logical bridge between the evidence in the record and the result reached.  *Steele*, 290 F.3d at 941.  On this record, the ALJ's failure to provide a narrative discussion of all the medical evidence does not warrant remand.  The ALJ satisfied his duty to articulate reasons for his residual functional capacity assessment. See, *e.g., Rice*, 384 F.3d at 371 (remand not warranted where ALJ failed to provide a written evaluation of every piece of evidence in the record so long as the ALJ satisfied his or her minimal duty to articulate reasons for the ultimate decision).  The ALJ's determination will not be remanded on this ground.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand. Accordingly, the decision is affirmed and final judgment will be entered.

Date: May 11, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net